FREEDOM HOLDINGS, INC., d/b/a, North American Trading Company, and International Tobacco Partners, Ltd., Plaintiffs,

v.

Eliot SPITZER, in his official capacity as Attorney General of the State of New York, and Arthur J. Roth, in his official capacity as Commissioner of Taxation and Finance of the State of New York, Defendants.

No. 02 Civ. 2939(AKH).

United States District Court,
S.D. New York.

Sept. 14, 2004.

David F. Dobbins, Sr., Walter Michael Luers, Patterson, Belknap, Webb & Tyler LLP, New York City, for Plaintiffs.

Avi Schick, New York State Department of Law(EPB), Albany, NY, Christine E. Morrison, Eliot Spitzer, Attorney General of the State of NY, New York City,

Julie Simone Brill, VT, Attorney General's Office, Montpelier, VT, Lewis Aaron Polishook, New York State Office of the Attorney General, New York City, for Defendants.

Leonard Violi, Law Offices of Leonard Violi, LLC, Mamaroneck, NY, for Movant.

## OPINION AND ORDER PARTIALLY GRANTING AND PARTIALL DENYING PRELIMINARY INJUNCTION

HELLERSTEIN, District Judge.

On January 6, 2004, the Court of Appeals for the Second Circuit, affirming and reversing my decision of May 14, 2002, remanded this case to me for further proceedings not inconsistent with its rulings. *Freedom Holdings Inc., et al., v. Spitzer, et al.,* 357 F.3d 205 (2d Cir.2004) (*Freedom Holdings I*), *reh'g denied, Freedom Holdings Inc., et al., v. Spitzer, et al.,* 363 F.3d 149 (2d Cir.2004) (*Freedom Holdings II*). The Court of Appeals affirmed my dismissal of the dormant Commerce Clause claim, reversed my dismissal of the Sherman Act claim, and vacated my dismissal of the Equal Protection claim.

The Mandate issued on April 30, 2004. Almost immediately afterwards, plaintiffs filed an amended complaint, a motion for summary judgment (the briefing of which is incomplete), and, by Order to Show Cause, a motion for a preliminary injunction. This last motion is before me now, and was the subject of oral argument on May 24 and June 2, 2004. For the reasons stated below, I grant the motion in part and deny it in part. I deny plaintiffs' motion to the extent that it seeks an injunction against enforcement of the Master Settlement Agreement between forty-six states and the four major cigarette companies and subsequently agreeing cigarette companies. I deny plaintiffs' motion to the extent that it seeks an injunction against

enforcement of the Escrow Statute, N.Y. Pub. Health Law §§ 1399–nn—pp, and the Contraband Statute, N.Y. Tax Law §§ 480(b), 481, 1846. However, I grant plaintiffs' motion to the extent that it seeks an injunction against enforcing the repeal of the Allocable Share Release provision of the Escrow Statute, N.Y. Pub. Health Law § 1399–pp, as amended, 2003 N.Y. Laws 666, eff. Oct. 15, 2003.

## I. Factual Background

Cigarette smoking is a scourge to our society. Before modern prohibitions against smoking in public institutions, cigarette smoke hung like a pall over baseball, basketball, and hockey stadia, fouled the air in the offices where we worked and the homes where we lived, and coated our lungs with tars and other poisons, shortening our lives and injuring our health.

In recent decades, many injured parties sued the tobacco companies, with mixed results. In the 1990s, governmental entities brought their own lawsuits, seeking to recover their damage—billions of dollars spent on Medicaid and other health costs caused by cigarette smoking—and to restrict and prevent various advertising and marketing practices of the cigarette manufacturers that tended to popularize cigarette smoking and cause young people to become addicted.

On November 23, 1998, a settlement was reached between forty-six states, the District of Columbia and several territories, and the four major cigarette companies, Philip Morris, Inc. ("Philip Morris," now Altria Group, Inc.), R.J. Reynolds Tobacco Co. ("R.J.Reynolds"), Brown and Williamson Tobacco Co. ("Brown & Williamson"), and Lorillard Tobacco Co. ("Lorillard"). The Master Settlement Agreement ("MSA"), a long and complicated agreement with many annexes, provided for substantial payments by the cigarette com-

panies to the states, an ability to recoup settlement costs by passing them on to consumers, incentives to other cigarette companies to join the settlement and protections against those that would not join, and various marketing and advertising restrictions intended to reduce the attraction of cigarettes, especially to young people.

### A. The MSA

The manufacturers who signed the MSA consented to a variety of marketing and advertising restrictions. Signatory manufacturers agreed that they would not "take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco Products." MSA Art. III(a). They agreed not to use cartoons such as Joe Camel in advertising or promotions, MSA Art. III(b), sponsor concerts or major sporting events using tobacco brand names, MSA Art. III(c)(1), or advertise on billboards, in shopping malls, or in transit systems. MSA Art. III(d). They agreed to refrain from selling clothing or other merchandise bearing a tobacco brand name, MSA Art. III(f), and from giving free samples or gifts based on proofs of purchase to youths under age eighteen. MSA Art. III(g), (h). They pledged not to pay for product placement in movies, television shows, theatrical performances, or video games, MSA Art. III(e), nor to enter into agreements restricting anti-tobacco advertising. MSA Art. III(d)(4).

Participating manufacturers also accepted limitations on their lobbying rights. They are prohibited from opposing state or local legislation "intended . . . to reduce Youth access to, and the incidence of Youth consumption of, Tobacco Products." MSA Art. III(m)(1). They also may not support congressional legislation which would override the MSA, or challenge state tobacco-related statutes, MSA Art. III(m)(3), V, or promote the diversion of MSA proceeds to uses that are not health-related. MSA Art. III(n). The MSA requires participating manufacturers to develop corporate principles that express their commitment to reducing youth smoking, to communicate those principles clearly to employees and customers, and to designate an executive level manager responsible for identifying methods of reducing youth smoking. MSA Art. III(i)(1), (2).

The MSA provides for the dissolution of several tobacco industry nonprofit research or trade organizations, and provides for state governmental oversight of any new tobacco-related trade organizations. MSA Art. III(o), (p). The MSA establishes a National Public Education Fund, financed by proceeds from payments under the MSA, to study and support the reduction of youth smoking and of smoking-related diseases. MSA Art. VI(a). For instance, the fund is authorized to support "sustained advertising and education programs" to counter youth smoking. MSA Art. III(g).

The four major tobacco companies, who were the original participating manufacturers to the settlement ("OPMs"), agreed under the MSA to make three sets of payments for a combined value of approximately $2.4 billion in the first year and $225 billion dollars over twenty-five years. See MSA Art. IX(b), (c).[1] The payments

---

1. One set of payments was to be made immediately after the MSA was executed and annually thereafter, on January 10, from 2000 through 2003. These base payments totaled $12,741,925,944. MSA Art. IX(b). The second set of payments was to be made annually "[o]n April 15, 2000 and on April 15 of each year thereafter in perpetuity," increasing from $4.5 billion in 2000 to $9 billion annually beginning in 2018. The second set of payments totals $207.89 billion between 2000 and 2025. MSA Art. IX(c)(1). The third set

of the OPMs were to be adjusted each year to reflect inflation, miscalculations of relative shares, and various other factors. *See* MSA Art. IX(b), (c). A Volume Adjustment, MSA Art. II(aaa), Exh. E, adjusts aggregate payments by the OPMs according to yearly changes in the quantity of cigarettes that they ship in or to the United States. If total shipments increase, the base payment is increased proportionally; if total shipments decrease, the base payment is decreased by 98 percent of the proportion of decrease. MSA Exh. E(A), (B)(i).[2]

The payments of each individual OPM were to be adjusted yearly as well, according to changes in its share of the entire United States market for cigarette sales, relative to the shares of the other three OPMs. As an OPM's market share increased relative to the other OPMs' shares of the market, so did that OPM's burden of payments relative to those of the other OPMs; as its relative market share decreased, so did its relative burden. MSA Art. II(mm).[3]

The settling states and territories agreed to allocate amongst themselves the moneys derived from the OPMs' payments under the MSA. Art. II(f), at 4, Exh. A. The percentages, or allocable shares, were negotiated among the settling states to reflect total smoking population, health care costs, and other relevant considerations. By far the largest allocable shares are those of California, 12.7639554 %, and New York, 12.7620310 %. The next largest allocable share is Pennsylvania's, which is 5.7468588 %, less than half of New York's. Kentucky's allocable share is 1.7611586 %.

The MSA provides an incentive for other cigarette manufacturers to join the payments scheme. Subsequent participating manufacturers ("SPMs") who agreed to join the MSA within the first sixty days after its execution by the OPMs were "grandfathered" into their 1998 market share or 125 % of their 1997 market share, whichever is greater. Grandfathered SPMs become liable for payments to the states only to the extent that their market share increases above those grandfathered levels; above those levels, their required payments are measured by the degree to which their yearly market shares increase relative, not to the entire market, but to the aggregate market share of the OPMs. MSA Art. IX(i). The relationship is reflected in the formula: (current market share—1998 [or 125 % of 1997] market share) / (current aggregate market share of OPMs).[4] As the Court of Appeals ob-

---

of payments was to be made annually "[o]n April 15, 2008 and on April 15 each year thereafter through 2017." The payments were in the amount of $861 million per year, or $8.61 billion in total. MSA Art. IX(c)(2). The three sets of payments combined have been called "the largest privately negotiated redistribution of wealth in world history." Margaret A. Little, *A Most Dangerous Indiscretion: The Legal. Economic, and Political Legacy of the Governments' Tobacco Litigation,* 33 Conn. L.Rev. 1143, 1171 (2001).

2. The 2% disproportion seems to mitigate slightly an aggregate decrease in payments to the states. Any decrease in payments under the Volume Adjustment is subject to reduction—that is, the OPMs' payments are adjust-

ed downwards somewhat less, according to a complex formula—if the aggregate operating income of the OPMs from yearly sales of cigarettes in and to the United States exceeds $7.195 billion (adjusted upward for inflation). MSA Art. II(aaa), Exh. E(B)(ii).

3. All payment calculations in the MSA are made on the basis of statistical data of the previous year. Thus the payments due on April 15, 2004, for instance, are based on audited and certified manufacturers' 2003 statistics regarding volume of sales, percentage of market share, and the like. ·See, e.g., MSA Art. II(mm), Exh. E(C).

4. For non-grandfathered SPMs, 1997 and 1998 market share are defined as zero, so that

served, the formula imposes on SPMs a payment obligation that increases by more than its proportional growth of market share:

> If the denominator were current aggregate market share of OPMs and SPMs, gaining market share from OPMs would be less harmful for SPMs, because the denominator would not change even when the numerator increased. But under the MSA, if the numerator increases because the SPM has taken market share from an OPM, the denominator decreases by the amount of the increase. Thus, the SPM's proportion of the annual payment increases by more than its proportion of overall market share.

*Freedom Holdings II*, 363 F.3d at 153. Thus, SPMs pay nothing to the states for their cigarette sales at or below their base of 1998 (or 125 % of their 1997) market share, but disproportionately higher payments for cigarette sales that increase their market shares above those levels, relative to the market shares of the OPMs.

The MSA provides a different protection relative to non-participating manufacturers ("NPMs"), by providing incentives to the states to enact legislation aimed at preventing NPMs from benefiting competitively by avoiding the onus of payment obligations to the states. The Escrow and Contraband Statutes, passed in virtually every signatory state, are the result of these provisions of the MSA. N.Y. Pub. Health Law §§ 1399–nn—pp; N.Y. Tax Law §§ 480(b), 481, 1846. The MSA pro-

vides an NPM Adjustment, reducing payment obligations of PMs to the extent they lose market share to NPMs.[5] However, the NPM Adjustment does not take effect if a state enacts Escrow or similar statutes imposing payment obligations on NPMs to the states. If a state fails so to legislate, payment obligations of the participating manufacturers ("PMs") are reduced by triple the PMs' aggregate market share loss for market share loss of between zero and 16⅔ %. If the market share loss increases above 16⅔ %, the trebling provision is replaced by a complex formula potentially increasing the PMs' discount. MSA Art. IX(d)(1)(A).

The NPM Adjustment is subject to several other conditions. It does not apply until cigarette shipments fall below 1997 levels. MSA Art. IX(d)(1)(D). The independent auditor appointed to administer the MSA must certify "that the disadvantages experienced as a result of the provisions of this Agreement were a significant factor contributing to the Market Share Loss." MSA Art. IX(d)(1)(C). And, as noted, the NPM Adjustment will not apply to any state which enacted an Escrow Statute, "and diligently enforced the provisions of such statute." MSA Art. IX(d)(2)(B).[6] The Escrow Statute is intended to "effectively and fully neutralize[ ] the cost disadvantages vis-à-vis Non–Participating Manufacturers." MSA Art. IX(d)(2)(E).

The Escrow Statute, passed by New York on November 27, 1999, "imposes a

---

the formula collapses to current market share divided by current aggregate market share of OPMs. MSA Art. IX(i)(4). Any manufacturer which consented to join the MSA more than sixty days after its initial execution by the OPMs becomes a non-grandfathered SPM. MSA Art. IX(i)(4). Both by number of manufacturers and by volume of sales, the majority of manufacturers which became SPMs did so within the first sixty days after the MSA's execution and became grandfathered.

**5.** The NPM Adjustment applies to the second and third sets of OPM payments, which account for all but $12.74 billion of the OPMs' aggregate payments. MSA Art. IX(c)(1), (2). The NPM Adjustment also applies to SPM payments. MSA Art. IX(i)(3).

**6.** If a state enacts and fully defends the model escrow statute, but it is invalidated by a court, the state may still avoid 65% of the NPM Adjustment. MSA Art. IX(d)(2)(F).

perpack fee on NPM-manufactured cigarettes that adds to the resale price of the product." *Freedom Holdings I*, 357 F.3d at 212. This fee, which is paid to an escrow account from which NPMs can recover under several eventualities, is currently $.0167539 per cigarette sold, or $3.35078 per carton, and increases slightly over time.[7] NPMs are entitled to receive interest on their payments while in escrow. MSA Exh. T; N.Y. Pub. Health Law § 1399–pp(2)(b). NPM payments are not made variable according to changes in their market shares, as are the payment obligations of the OPMs. Unlike SPMs, NPMs are not "grandfathered" and entitled to exclude a certain percentage of their sales below a base level. While PMs' payments are tax deductible, NPM escrow payments are probably not tax deductible, with the possibility (disputed) that they could become tax deductible if rights to reversion and interest were to be surrendered.

Under the Escrow Statute as initially enacted, *see* MSA Exh. T., N.Y. Pub. Health Law § 1399–pp (McKinney 2002), 1999 N.Y. Laws 536, eff. Nov. 27, 1999, an NPM could recover funds that it placed into escrow under three circumstances. First, the funds placed into escrow could satisfy a judgment or settlement on a tobacco-related claim. Second, an NPM could recover funds that it placed into escrow in a particular state to the extent that those funds exceeded the amount that that state would have received from that manufacturer as its allocable share, had the manufacturer been an SPM. Third, to the extent that an NPM does not recover from the escrow fund through those two methods, its funds are to be released from escrow after twenty-five years. *Id.*

§ 1399–pp(2)(b). The statutory provision allowing for the second of these three methods of releasing funds, N.Y. Pub. Health Law § 1399–pp(2)(b)(ii), is commonly known as the Allocable Share Release provision.

The Contraband Statute was passed by New York on December 28, 2001, as an enforcement mechanism for the Escrow Statute. As described by the Court of Appeals, *Freedom Holdings I*, 357 F.3d at 213–15, it requires each manufacturer to certify annually that it is either a PM making payments under the MSA, or in compliance with the Escrow Statute. If a manufacturer fails so to certify or if the Commissioner of Public Health determines that the manufacturer is in violation of the Escrow Statute, state tax stamp agents are prohibited from stamping that manufacturer's cigarettes. Penalties for violation of the Contraband Statute include seizure and forfeiture of cigarettes, monetary liability, and suspension or cancellation of the manufacturer's license. N.Y. Tax Law §§ 480–b, 481, 1846.

The Allocable Share Release provision was amended, effective in New York on October 15, 2003, and to date the same amendment has been passed in approximately thirty states. Under the amended law, an NPM can recover funds it placed into escrow only to the extent that they are greater than the total amount of payments that manufacturer would have been required to pay to all states had it been an SPM. N.Y. Pub. Health Law § 1399–pp, as amended, 2003 N.Y. Laws 666, eff. Oct. 15, 2003. The statutory amendment provides, in effect, that escrowed amounts formerly returned to NPMs would now be

---

7. The escrow payment was $.0094241 per cigarette, or $1.88482 per carton, in 1999, and it rises to $.0188482 per cigarette, or $3.76964 per carton, beginning in 2007. MSA Exh. T;

N.Y. Pub. Health Law § 1399–pp(2)(a)(i), (v). A pack contains twenty cigarettes and a carton contains ten packs, so that a carton equals 200 cigarettes.

retained in escrow for 25 years, and in the interim would be available only to satisfy a judgment or settlement on tobacco-related claims.

### B. Statistical Data

The payment obligations of the OPMs are stated in base amount in the MSA, but are adjusted according to several formulae which take market share and other factors into account. The payment obligations of the SPMs are based on their relative market shares and those of the OPMs. By contrast, the NPMs' payments are a flat fee per cigarette sold. The contrast makes the various types of payments difficult to compare, leaving it open to question which manufacturers have, in practice, paid higher or lower amounts under the MSA, or whether any such differences are material. Statistical data provided by PriceWaterhouse Coopers, the independent auditor responsible for overseeing the calculations to be made pursuant to the MSA, show that payments per carton have been as follows:

| Year | OPM | SPM Grandfathered [8] | SPM Not Grandfathered | NPM |
|------|-----|------------------------|------------------------|-----|
| 1999 | $3.92600 | $0.48336 | $2.02476 | $2.01656 |
| 2000 | $4.34052 | $0.69332 | $2.36810 | $2.34180 |
| 2001 | $5.15794 | $1.15656 | $3.13972 | $3.12976 |
| 2002 | $4.98840 | $1.61918 | $3.28210 | $3.27330 |
| 2003 | $4.16913 | $1.83088 | $3.97212 | $3.96144 |

According to these figures, in any given year, the OPMs have had the highest per cigarette payment obligations, and the SPMs who have had the benefit of averaging their costs because of the benefits given to them under the grandfather clause, have had the lowest. NPMs' payment obligations have been between these two poles. NPMs' payment obligations have consistently been less than, although very close to, those of SPMs who did not have the benefit of the grandfather clause.[9]

Plaintiffs also allege that NPMs' escrow payments are taxed, while the MSA payments of PMs are tax deductible. In response, New York State (the "State") submits an affidavit by Marvin Chirelstein, tax professor at Columbia Law School, who maintains that the NPMs' payments could be structured as tax deductible, if the NPMs were willing to cede their reversionary and interest rights in those payments. The State supports this assertion with an affidavit by Todd Kerner, a New

---

**8.** This figure represents the average of cigarettes sold without payment, pursuant to the grandfather clause and cigarettes sold with payments of increasing proportions for sales above grandfathered levels.

**9.** Because the Escrow Statute required NPMs to pay a stated amount per cigarette sold, the figures for payments per carton should, in theory, be strict multiples of the figures for payments per cigarette provided by the Escrow Statute. For instance, the Escrow Statute provides that in 2003, NPMs pay

$.0167539 per cigarette sold; because there are 200 cigarettes in a carton, one would expect that the figure for NPM payments per carton should be $3.35078. The figures provided by PriceWaterhouse for NPM payments per carton, per year, are somewhat higher: $3.96144 per carton for 2003, for example. Presumably the difference stems from the Escrow Statute's requirement that its figures be adjusted for inflation. See N.Y. Pub. Health Law § 1399–pp(2)(a). Neither party presented arguments regarding this point.

York State taxation agent, who maintains that if an NPM would attempt to cede its reversionary rights and structure its payments as Professor Chirelstein suggests, New York (and presumably other states) would accept the payments as fully deductible. Plaintiffs contend that they have tried that in other states, but have been blocked from doing so, and that PriceWaterhouse has also taken the position that escrow payments are not tax deductible.[10] Moreover, the State has submitted no evidence on the position of the IRS regarding the relative tax treatment of PM and NPM payments.

Of equal importance to the volume of payments is their effect on, or reflection of, competition. According to the data provided by PriceWaterhouse, the volume of OPM sales has decreased since the signing of the MSA, from 455 billion cigarettes in 1998 to 344 billion cigarettes in 2003, a reduction of 24 percent. Prices charged by the OPMs increased during this period, not only to cover the cost of the settlement

with the states, estimated at $.19 per pack, but by $.45 per pack when the MSA was signed in November 1998 and, including subsequent increases, by a total of $1.27 through April 2002. The average retail price of an OPM-manufactured pack of cigarettes was $1.49 per pack before the MSA was signed in November 1998 and $2.76 per pack in April 2002, an increase of over 85 percent.

As the volume of OPM sales fell between 1998 and 2003, the volume of SPM sales rose from 14.12 to 30.08 billion cigarettes, or 113 percent. The volume of NPM sales rose even more during this same period, from 2.43 to 33.31 billion cigarettes, or 1271 percent. The market share of the OPMs shrank over this time period from 96.5 % to 84.5 %. The market share of the SPMs grew from 3 % to 7.4 %, and the market share of the NPMs grew from 0.5 % to 8.2 %. The following chart reflects the shift in volume and market share from 1998 to 2003.[11]

| Year | OPMs (billions; %) | | SPMs (billions; %) | | NPMs (billions; %) | | Total |
|------|---------|-------|--------|------|--------|------|--------|
| 1998 | 455.22 | 96.5% | 14.12 | 3% | 2.43 | 0.5% | 471.77 |
| 1999 | 422.00 | 92.3% | 18.00 | 3.9% | 17.10 | 3.7% | 457.10 |
| 2000 | 401.49 | 91.4% | 22.63 | 5.2% | 14.89 | 3.5% | 439.01 |
| 2001 | 383.31 | 89.4% | 26.70 | 6.2% | 18.70 | 4.4% | 428.71 |
| 2002 | 364.31 | 86.1% | 30.67 | 7.2% | 28.20 | 6.7% | 423.18 |

**10.** Jeffrey Avo Uvezian, the President of plaintiff International Tobacco Partners, Ltd. ("ITP"), states that his company imports Grand Tobacco cigarettes, which had an escrow obligation to Hawaii of less than ten dollars and does not intend to sell more cigarettes in that state. "To avoid the time and expense of opening an escrow account and maintaining it for 25 years for about ten dollars, ITP ... offered to pay the amount due directly to Hawaii.... No matter how we proposed to structure the transaction, [Hawaii] refused to accept the money, stating that ... the only way for ITP to fulfill its obligation was for ITP to sign an escrow agreement, establish the required sub-account, name a registered agent, and hold the money for 25 years."

**11.** This data was provided by plaintiffs and attributed to PriceWaterhouse. The figures have been rounded. The State provided figures attached to the Declaration of Patricia Tilton, a principal at PriceWaterhouse. The figures attached to the Tilton Declaration are similar to those above, with slight and generally inconsequential variations. An exception is the figures for 2001, when a different categorization altered the market size by 15 billion cigarettes. The figures used here give a more accurate picture of the 2001 market, and are otherwise closely enough confirmed by the Tilton Declaration figures that I accept them as reliable.

| 2003 | 344.61 | 84.5% | 30.08 | 7.4% | 33.31 | 8.2% | 408.00 |
|---|---|---|---|---|---|---|---|
| 2004 (est.) | 335 | 83.75% | 30 | 7.5% | 35 | 8.75% | 400 |

The percentages of market shares among the OPMs have also changed, although not to as large an extent. In 1998, Brown & Williamson made 15.4 percent of total sales by OPMs. By 2003, that figure had declined to 11.5 percent, a loss of over 25 percent of its relative market share. Philip Morris gained commensurately; as a percentage of total OPM sales, its share rose from 50.5 percent in 1998 to 54.7 percent in 2003. The relative market shares of Lorillard and R.J. Reynolds, as percentages of total OPM sales, have remained relatively consistent since the MSA was signed. Lorillard's relative market share has stayed between 9.4 percent and 10.8 percent. R.J. Reynolds's relative market share has hovered between 23.5 percent and 25.1 percent.

The statistical trend of declining volume and market share on the part of the OPMs, and increasing volume and market share of NPMs, has been the subject of concern to the OPMs. In the months following the signing of the MSA, the OPMs' share prices fell steeply, but the prices began rising in early 2000 and substantially recovered by early 2002. During 2002, in order to hold market share, the OPMs began offering a variety of promotions, including buy-two-get-one-free giveaways. In response, the OPMs' stock prices once again began to decline. Philip Morris announced on September 26 and November 12, 2002 that it would not meet growth forecasts, and its share price fell further, declining from approximately $58 per share in June 2002 to under $30 per share in early 2003. R.J. Reynolds's share price fell from over $70 per share to $27 per share in the same time period. Altria, which in 2002 became the new name of the parent company which was formerly Philip Morris, began the Business Review section of its 2002 Annual Report by listing "heightened competition" among the factors responsible for the weakened position of its domestic tobacco manufacturing subsidiary, Philip Morris USA:

The year was characterized by the convergence of several factors, including a weak economic environment and resulting consumer frugality, sharp increases in state excise taxes and heightened competition. Industry shipment volume in 2002 ... declined by 3.7 % to 391.4 billion units, while PM USA's shipment volume declined 7.5 % to 191.6 billion units.

Altria explained, however, that it had "strategies in place" to ensure a stronger market position in the future, and in the Business Review section of its 2003 Annual Report, Altria described its strategies in more detail, including lobbying for

federal and state initiatives that are designed to provide governments with additional tools to ensure that cigarette manufacturers comply with their Master Settlement Agreement (MSA) payment obligations or the escrow deposit requirements of related state laws, that the availability of counterfeit cigarettes is significantly reduced, and that the illegal sale of cigarettes and non-payment of taxes are dealt with effectively. Significant progress has been made on many of these issues.

Prior to 2003, only eight states had passed Contraband Statutes; during 2003, thirty-one did. On March 20, 2003, West Virginia became the first state to repeal its Allocable Share Release provision and, by year's end, eighteen states, including New York, had followed suit. The OPMs' stock prices began to rise in May 2003, and have generally continued in the same direction

since then. Altria described its market position more positively in its 2003 Annual Report, noting that "Philip Morris USA Inc. (PM USA) volume began to stabilize and its retail share increased sequentially during each quarter of 2003, with improved results in the fourth quarter."

The record does not provide a satisfactory economic analysis as to the cause of the statistical trends which have seen OPMs' market shares decline steadily since 1998, notwithstanding the enactment of Escrow and Contraband Statutes, and which have seen SPMs' and NPMs' market shares rise. The Court of Appeals, accepting the allegations of the complaint, ruled that the MSA created the constituent elements of a cartel, *Freedom Holdings I,* 357 F.3d at 226, but the statistical trends are not consistent with those rulings and, indeed, contradict them. The plaintiffs alleged, and the Court of Appeals assumed, a large degree of inelasticity of demand, but the price increases imposed by the OPMs have resulted in loss of market share to OPMs, in favor of both SPMs and NPMs. The Escrow and Contraband Statutes were enacted by the states in response to the incentives provided to them under the MSA to create equivalent obligations on NPMs to those imposed on OPMs and SPMs. *See* MSA Art. IX(d)(2)(E) (Escrow Statute "effectively and fully neutralizes" competition from NPMs). Yet the statistical trends have shown no adverse competitive impact on the NPMs following passage of those Statutes.

An explanation offered by the NPMs may be found in the workings of the Allocable Share Release provision. As explained above, the MSA allocates among the various settling states the moneys paid by PMs according to each state's allocable share. MSA Art. II(f), at 4; Exh. A. Under the Escrow Statute as initially enacted, *see* MSA Exh. T., N.Y. Pub. Health Law § 1399–pp (McKinney 2002), 1999 N.Y. Laws 536, eff. Nov. 27, 1999, an NPM could recover funds that it placed into escrow in a particular state to the extent that those funds exceeded the amount the state would receive from that manufacturer as its allocable share, had the manufacturer been an SPM. Thus, an NPM, by concentrating its distribution regionally, to just a few states, could recover a greater percentage of the total money it placed into escrow because those states were allowed to retain only their relatively small percentage shares.

In practical effect, the Allocable Share Release provision provided NPMs with substantial competitive advantages from concentrating their efforts on regional cigarette distribution. If an NPM distributed its cigarettes nationally, and its distribution patterns approximated those of the national market, its payment obligations on its national sales would be apportioned 100 percent among the settling states, with the result that something close to 100 percent of its payments would, in the aggregate, be retained under the Escrow Statute and not released under the Allocable Share Release provision. However, if an NPM were to concentrate its business to the New York—New Jersey—Connecticut area, for instance, it could gain a competitive advantage in that region, because it would make 100 % of its sales there and would be able to recoup the payments on all but roughly 16.5 % of them, these being approximately the percentage shares of those states. While the OPMs and SPMs would be required to continue 100 % of their payments under the MSA, an NPM which focused on the New York metropolitan area could be exempt (aside from the time-value of its money between when it was escrowed and when it was released) to

the extent of over 80 % of its business.[12]

The Declaration of Everett W. Gee III, submitted by plaintiffs, demonstrates this strategy. Gee, the Vice President and General Counsel to S & M Brands, Inc., a Virginia-based NPM, explained that his company was presented with the option of (1) signing the MSA, becoming an SPM, and reducing its ability to increase sales beyond their 1998 (or 125 % of their 1997) levels; or (2) not signing the MSA, "but remain[ing] regional so as to avoid making payments on a national scale.... Thus, S & M gave up its dream to be national, settling into the MSA's rules even as an NPM by remaining a regional presence." By selling only in the Southeast, S & M was able to keep its prices lower and continue its growth within that regional market.

Plaintiffs allege that the repeal of the Allocable Share Release provision has halted this process. An NPM can effectively no longer recover funds it placed into escrow, except to pay a judgment or settlement against it, or after 25 years. See N.Y. Pub. Health Law § 1399–pp, as amended, 2003 N.Y. Laws 666, eff. Oct. 15, 2003. Thus, according to plaintiffs, the barriers against NPMs have been heightened dramatically, and the ability of an NPM to gain a competitive advantage within a regional market has been essentially arrested. However, no independent statistical information has been presented to confirm, or rebut, this thesis; the change in law is too recent.

## C. Procedural Background

In April 2002, Freedom Holdings Inc. and International Tobacco Partners, Ltd., two cigarette importers who were not participants to the settlement, and who imported cigarettes from foreign manufacturers who were also not participants to the settlement, filed this lawsuit on behalf of themselves and others similarly situated. By their lawsuit, they sought to enjoin New York State from enforcing the MSA to the extent that it preserved the market domination of the OPMs amongst themselves and against others, and the statutes passed by the State to enforce the MSA against non-participating companies like plaintiffs. The State moved to dismiss, and I granted its motion. Relying on Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), I held that the anticompetitive provisions notwithstanding, the State had acted pursuant to its traditional police powers, and such action was protected against the reach of the federal antitrust laws.

The Court of Appeals reversed, holding that plaintiffs had alleged valid claims for relief as to their antitrust and equal protection counts, and remanded the case to me. Two of the three judges constituting the panel[13] held that the State had not

12. Because New York's allocable share is high, plaintiffs explain, many NPMs avoided selling cigarettes in New York and decided to sell instead elsewhere in the country, where they could recover a higher percentage of their escrow payments. For instance, plaintiff International Tobacco Partners, Ltd. ("ITP") has sold no cigarettes in New York since before 2000, but sold approximately 23 million Tough Guy cigarettes and 61 million Boston cigarettes in Kentucky in 2002, and 38 million Tough Guys and 44 million Boston cigarettes in 2003. ITP made escrow deposits for both Tough Guys and Bostons sold in Kentucky in 2003; because Kentucky's allocable share is 1.7611586%, ITP could recover over 98% of the escrow payments it made on sales in Kentucky. Logically and arithmetically, however, an NPM could just as effectively concentrate its distribution into the New York market, with its large smoking population, and gain regional competitive advantage in this market.

13. Judge Ralph K. Winter wrote the decision on behalf of Judge Sonia Sotomayor and himself. 357 F.3d at 208. Judge Robert D. Sack

sufficiently articulated the policy goals that made it necessary to allow the major cigarette manufacturers to organize themselves into a cartel, and all three judges held that the State had not regulated the anticompetitive features of the settlement to minimize their anticompetitive effects in relation to the states' concerns for the public health of their citizens.

The Court of Appeals ruled that where a state statute restricts competition, the question whether the statute is preempted by the Sherman Act "is determined by a two-step analysis":

> The plaintiff must first show that the scheme of market control created by the statute would constitute a per se violation of the Sherman Act if brought about by an agreement among private parties.... Even if a per se violation is shown, the alleged anticompetitive scheme may still be immunized under the *Parker* state action doctrine ... if: (i) the restraint in question is "clearly articulated and affirmatively expressed as state policy" and (ii) the policy is "actively supervised" by the state itself.

*Freedom Holdings I*, 357 F.3d at 222–23 (quoting *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980)). Based on the allegations of the complaint and on the Third Circuit's decision in *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.*, 263 F.3d 239 (3d Cir.2001), the Court of Appeals ruled:

> The alleged arrangement, even without the protection of the Contraband Statutes as enforced by wholesalers, would be a per se violation because it is a naked restraint on competition, albeit one subject to erosion by NPMs. With the Contraband Statutes in force, the scheme as alleged threatens to become a

permanent, nationwide cartel.... We therefore hold that appellants have sufficiently alleged a per se violation of the Sherman Act.

*Freedom Holdings I*, 357 F.3d at 226. A flat state tax on all manufacturers and importers of cigarettes, measured by their sales rather than their market shares, and without the protective features of the MSA tending to preserve market shares, could have just as easily vindicated the interests of the states. However, the Court of Appeals held, the per se violation of the Sherman Act notwithstanding, the restraint on competition imposed by the MSA and the statutes enacted pursuant to the MSA could be saved from illegality if the *Parker v. Brown* exception, exempting state action from the preemptive effect of the Sherman Act, were to apply. As the Court of Appeals explained, the exception for state action applies "only if (i) the restraint in question is 'clearly articulated and affirmatively expressed as state policy,' and (ii) the policy is 'actively supervised' by the State itself." *Freedom Holdings I*, 357 F.3d at 226 (quoting *Midcal*, 445 U.S. at 106, 100 S.Ct. 937).

On the first of these two prongs, the Court of Appeals ruled that the action was in fact taken by the State, and it reduced the question to whether "the State's policy goals are sufficient to qualify for the *Parker* immunity—simply protecting private parties from competition is not a sufficient goal." *Id.* at 227. Reviewing the legislative history of the Escrow and Contraband Statutes, the Court of Appeals ruled that the State's interest in protecting and enhancing the revenue it expected from the MSA animated the passage of the statutes far more than the conclusory rationale of protecting the public health. *Id.* at 227–31. Because, the Court of Appeals held, "the MSA requires the PMs to pay a fixed

concurred in a separate opinion. *Id.* at 235 (Sack, J., concurring).

fee per cigarette but leaves them free to set whatever price they choose, the resolution of the price/sales/public health conflict is left by the MSA to the PMs," whose concern is for profits rather than public health. *Id.* at 230. Accordingly, the Circuit held that "the relationship of such [public health] benefits to the restraint on competition is not obvious and may even be counterproductive." *Id.* at 230–31.

Addressing whether the allegedly anticompetitive provisions are "actively supervised" by the State, the second prong of *Midcal,* the Court of Appeals held that they are not. *Id.* at 231. Finally, the Second Circuit rejected the State's argument that the MSA reflected *Noerr-Pennington* rights, rights under the First Amendment to petition the state governments for relief. The Court of Appeals held that the First Amendment doctrine is irrelevant to the issues arising from the complaint. *Id.* at 233.

The Court of Appeals, with respect to all these rulings, emphasized that it was dealing with only the allegations of the complaint, and was assuming the truth of facts and conclusions alleged by the plaintiffs.[14]

Judge Sack, concurring, agreed with the majority that the State had not satisfied the second *Midcal* prong, requiring the State's active supervision of the anticompetitive features of the MSA, but differed with the majority as to the first *Midcal* prong. That prong, Judge Sack stated, "requires only that the state offer a clear articulation of a state policy to authorize anticompetitive conduct," and "seems easily met here, or at least seems as though it would be capable of proof

before the district court on remand." *Id.* at 236. As Judge Sack put it, "The 'clear articulation' standard is not strict." *Id.* Judge Sack thus expressed doubt that the majority should have impugned the State's motivation for entering into the MSA, and questioned whether comparing the MSA's payment provisions with a flat tax was appropriate. *Id.* at 238–39. He commented that since "this action is being returned to the district court for further proceedings . . . the State may be able to satisfy both *Midcal* factors as a matter of fact." *Id.* at 238.

Defendants petitioned the panel for reconsideration, but the Court of Appeals confirmed its rulings, in an opinion dated March 25, 2004. The State argued that "the complex market share arrangements of the MSA" were not anticompetitive, as the Court of Appeals had ruled, but "have no purpose other than to impose a flat levy per cigarette sold." *Freedom Holdings II,* 363 F.3d at 152. The Court of Appeals rejected the State's arguments, commenting that on the State's view, the MSA's payment provisions would amount to "a superfluous maze leading to a result that could have been achieved in a simple, straight-forward manner." *Id.* Judge Winter, again writing for the panel and "[c]onstruing the complaint's allegations most favorably to the plaintiffs," *id.,* ruled that the MSA (1) confers tax benefits on SPMs over NPMs; (2) confers benefits on SPMs who joined the MSA within sixty days of its execution over those SPMs who joined later; and (3) confers benefits on OPMs over SPMs, by penalizing SPMs for increases in market share to an extent greater than their actual market gains.

---

14. *See, e.g.,* 357 F.3d at 208 ("[a]ppellants allege—and at this stage we must assume their allegations to be true"); 209 ("Because this appeal is from a dismissal on the pleadings, we assume the factual allegations of the complaint to be true."); 216 ("We accept as true the material facts alleged in the complaint and draw all reasonable inferences in plaintiffs' favor."); 225 (subsection (ii) entitled "The Allegations of the Complaint"); 230 ("at this stage in the proceeding and given the allegations of the complaint").

*Id.* at 153. Judge Winter ruled that these features, and others, gave rise to a cartel favoring the OPMs, inter se and against SPMs and NPMs, and constituted a per se violation of the antitrust laws.

The Court of Appeals reaffirmed that the State's policy goals failed to exempt it from antitrust liability. *Parker v. Brown* did not apply, the Court of Appeals held, because the State did not relate the anticompetitive features of the Escrow and Contraband Statutes to the legitimate State policies of protecting public health and forcing cigarette manufacturers to assume the costs of health care caused by their marketing and sale of cigarettes. As the Court of Appeals explained, the State "never states how the alleged market-sharing scheme furthers those goals. It simply denies that the market-sharing scheme is anticompetitive, leaving the purpose of this complex, carefully drafted set of rules an enigma." *Id.* at 156.

Clarifying its earlier decision, the Court of Appeals allowed that *Parker v. Brown* might be satisfied even without the State's articulation of how the MSA furthered legitimate State policies, so long as the State "actively supervised" the cartel created by the MSA. Referring to the requirement that the State articulate why the anticompetitive features of the MSA express legitimate State policy as the "ancillary purpose" of the first prong of *Midcal,* Judge Winter stated, "the *Parker* analysis and the ancillary purpose of the *Midcal* prong

are interchangeable," and the "failure to meet the ancillary purpose test alone— where *Parker* was clearly satisfied ...— would not be enough to upset a statute." *Id.* at 155. The holding of the Court of Appeals, Judge Winter stated, "expressly relied on the challenged scheme's failure to meet the second *Midcal* prong," the requirement of the State's active supervision. *Id.* at 157. In so ruling, the Court of Appeals emphasized, it was deciding on a Rule 12 motion, and accepting the allegations of the complaint as if proved, without having ascertained if plaintiffs could actually prove the anticompetitive facts they alleged.[15] Thus, the Court of Appeals reversed my decision of May 14, 2002 and reinstated the complaint. *Id.* at 151.

Following remand, plaintiffs amended their complaint and moved for a preliminary injunction, seeking to enjoin New York State from enforcing the MSA, and the statutory enactments ancillary to the MSA, as respects Non–Participating Manufacturers and importers. Specifically, they seek to enjoin enforcement of the Escrow Statute, N.Y. Pub. Health Law § 1399–pp; the Contraband Statute, N.Y. Tax Law §§ 480–b, 481, 1846; and the recently amended Allocable Share Release provision, N.Y. Pub. Health Law § 1399–pp, as amended, 2003 N.Y. Laws 666, eff. Oct. 15, 2003. They argue that these laws enforce a cartel which has the purpose and effect of maximizing the OPMs' profits and discouraging the sales of cigarettes by NPMs.

---

**15.** *See, e.g.,* 363 F.3d at 151 ("the anticompetitive effects of the MSA involved disputed issues of fact for trial"); 151–52 ("[W]e therefore accept as true the material facts alleged in the complaint and draw all reasonable inferences in the plaintiffs' favor. Nevertheless, we may, as we did in our earlier opinion, view those allegations in light of the full terms of the Escrow and Contraband Statutes ... and the MSA." (citations omitted)); 152 ("[c]onstruing the complaint's allegations most favorably to the plaintiffs"); 153 ("if these allegations are true" ... "again viewing the allegations in the light most favorable to appellants"); 154 ("Given the allegations of the complaint, we cannot dismiss a challenge to this scheme on the grounds that it is not, as a matter of law, anti-competitive. For reasons stated in our earlier opinion and here, the complaint alleges such an effect and plaintiffs are entitled to attempt to prove it."); 157 ("It is too soon to say whether the state will ultimately be able to elicit evidence sufficient to meet this second prong.").

New York State, opposing the motion, argues that the statistical evidence of competition, compiled by a neutral and nationally recognized firm of certified public accountants appointed pursuant to the MSA, is inconsistent with the existence of a cartel, and disproves it. All that is happening, the State argues, is that NPMs are not being allowed to skim the market, to take advantage of the fact that competitor cigarette manufacturers responsibly pay for the public health costs they create while the NPMs do not, and in so doing unfairly jeopardize the public health purposes that the MSA advances. The NPMs, the State argues, are being asked to pay no more into escrow than the amounts that PMs are required to pay, so that all incremental costs in relation to cigarette sales, from whatever source, are equal, per cigarette sold. Furthermore, the State argues, the articulation of a public purpose animating the MSA is plain and clear to see: (1) the MSA effectively shifts the costs of injury to the public health from the states to the companies that caused those injuries, and (2) the shifting of such costs by cigarette manufacturers to consumers, adding to the price of cigarettes, along with severe restrictions on future advertising and marketing by cigarette manufactures, particularly as directed towards young people, effectively deters consumers from purchasing the volume of cigarettes that they once did.

Plaintiffs argue that the MSA, and the ancillary statutory enactments, have created a cigarette cartel, well beyond any legitimate state interest. The MSA, they argue, provided for yearly adjustments of payments to the states according to percentage changes of market control, thus tending to reward market-share stability. Furthermore, the NPM Adjustment, by reducing payment obligations of OPMs corresponding to three times their losses of market share from sales gained by NPMs unless states enact and defend measures against NPMs, creates incentives to states to enforce the MSA against NPMs and deter competition from NPMs. As to contrary statistical trends, plaintiffs attribute the sales growth of NPMs to a certain slowness by the states in enforcing the MSA. The recent amendment by New York and most other participating states of the Allocable Share Release provision should, it is expected, reverse the secular trends and protect the market share of the PMs. Indeed, according to plaintiffs, insuring a continuing flow of money from PMs gives the states a strong incentive to enact ever more stringent laws to assure that the PMs' market positions remain secured, protected by their settlements with the states.

I have carefully reviewed the record supporting, and opposing, plaintiffs' motion for a preliminary injunction, and heard both sides in extended argument, spreading over two days. I hold that plaintiffs have shown neither a likelihood of success on the merits nor irreparable damage with respect to the MSA, the Escrow Statute, or the Contraband Statute sufficient to justify preliminary injunctive relief. However, the recent repeal of the Allocable Share Release provision threatens to jeopardize the ability of the NPMs to compete with the SPMs and OPMs, and thereby to cause them serious and irreparable injury. To that extent only, a preliminary injunction will be granted. Since this issue, and all others, will have to be fully explored at trial, my ruling will have the effect of preserving the competitive status quo until the trial and final judgment.

## II. Discussion

### A. Standard for Preliminary Injunction

Generally, "[p]reliminary injunctive relief is appropriate when a plaintiff estab-

lishes (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in [plaintiff's] favor." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 108 (2d Cir.2003) (brackets in original). In several circumstances, however, a heightened standard must be satisfied. Two such circumstances are present here.

First, a heightened standard applies "where (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). An injunction in such a case is considered "mandatory" because it "is said to alter the status quo by commanding some positive act." *Id.* In such a situation, plaintiffs must show "a greater likelihood of success" and make "a clear showing that the moving party is entitled to the relief requested, or [that] extreme or very serious damage will result from a denial of preliminary relief." *Id.; see also Great Earth Int'l Franchising Corp. v. Milks Developments, Inc.*, 302 F.Supp.2d 248, 251 (S.D.N.Y.2004). Although no positive act would be required by an injunction here, the scope of injunctive relief requested by plaintiffs would significantly alter the status quo, give plaintiffs substantially all the relief they seek, and cost defendants revenue in ways that they claim could not be undone. Accordingly, the heightened *Tom Doherty* standard applies here.

A heightened standard is also appropriate "where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989); *see also Bery v. New York City*, 97 F.3d 689 (2d Cir.1996) (quoting *Plaza Health Labs* ). In such a situation, the moving party must establish "a probability of success on the merits," *Plaza Health Labs.*, 878 F.2d at 580. Accordingly, plaintiffs may not obtain an injunction by showing a reasonable question on the merits plus a balance of hardships tipping in their favor. Plaintiffs must instead satisfy the stricter preliminary injunction standard, by demonstrating both a clear showing of irreparable injury in the absence of such an injunction, and a greater likelihood of success on the merits. *Plaza Health Labs.*, 878 F.2d at 580; *see also Tom Doherty*, 60 F.3d at 34 (requiring irreparable injury and "a more substantial showing of likelihood of success"); *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir.2000) (equating the *Tom Doherty* and the *Plaza Health Labs* standards).

Plaintiffs argue that the Clayton Act provides a less stringent standard, requiring a showing of only "threatened loss or damage." 15 U.S.C. § 26 (covering any "violation of the antitrust laws"). But plaintiffs are mistaken. This provision eases the requirement of standing for suit under the antitrust laws, allowing suit for threatened rather than actual harm. It does not affect the standard for granting a preliminary injunction. *See Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1358 (6th Cir.1985) ("the courts have recognized a lower threshold standing requirement" under this provision; nevertheless, "although there is a lesser threshold standard, plaintiffs must nonetheless make a sufficient showing of potential or threatened antitrust injury to meet the customary re-

quirements for a grant of preliminary injunctive relief"); *Kay Instrument Sales Co. v. Haldex Aktiebolag*, 296 F.Supp. 578, 579 (S.D.N.Y.1968) ("In determining whether to issue a preliminary injunction, however, there is nothing exceptional by reason of the presence of antitrust elements; the normal principles of equity are applicable."). Indeed, the text of the statute provides that an injunction can be obtained "under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." 15 U.S.C. § 26. Accordingly, the heightened standard applies. *See* Tr. June 2, 2004, at 4.

### B. Likelihood of Success on the Merits

In order to show a likelihood of success on the merits, plaintiffs must show, first, a likelihood that the MSA, Escrow Statute, Contraband Statute, and amended Allocable Share Release provision establish a cartel constituting a per se violation of the federal antitrust laws, *see Freedom Holdings I*, 357 F.3d at 222–23, and second, a likelihood that the antitrust violations are not exempt from the reach of the antitrust laws under the doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). I address the two issues in turn, recognizing that the two decisions of the Court of Appeals state the law of the case which I must follow but that they are based, not on fact, but on plaintiffs' allegations of fact that they claim to be able to prove. The facts as proved, however, tell a quite different story, giving rise to very different applications of the same principles of law.

### 1. Per Se Violation

■ The opinions of the Court of Appeals did not define what conduct constitutes a "per se violation" of the antitrust laws. The caselaw and literature suggest several strands of understanding, giving rise to different legal conclusions. Under one strand of understanding, the term could be shorthand for a category of cases where a court, instead of having again to consider alleged defenses that previous cases have rejected, might sweep away these failed justifications, shortcut the traditional "rule of reason" analysis, and peremptorily hold the conduct invalid. But the term also could be applied to hold an entire class of activities invalid per se, without even considering any justifications. In the instant case, upon the facts presented, it is unclear that the MSA and the challenged statutes amount to a per se restraint on competition.

The first strand of caselaw may be best viewed through the lengthy discussion of the per se rule found in *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (*NCAA*). In that case, the NCAA had established a limit on the number of college football games which could be televised. The University of Oklahoma contracted to televise more games than the NCAA would permit, and it challenged the NCAA's limitation as an antitrust violation. The Supreme Court explained that the per se standard would normally be applied to cases involving price fixing and output limitations, since these practices "always or almost always tend to restrict competition and decrease output." *Id.* at 100, 104 S.Ct. 2948 (quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979)). The Court declined to apply the per se rule, however, holding that horizontal restraints were desirable "[i]n order to preserve the character and quality of the 'product,'" college football. *Id.* at 104, 104 S.Ct. 2948. The Court proceeded to analyze the restriction under the rule of reason, explaining that

"the essential inquiry" of both the per se rule and the rule of reason "remains the same—whether or not the challenged restraint enhances competition." *Id.* Stating that "there is often no bright line separating per se rules from Rule of Reason analysis," the Court instructed that because under both tests "the criterion to be used in judging the validity of a restraint on trade is its impact on competition," the per se rule, despite its name, "may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *Id.* at 104 & n. 26, 104 S.Ct. 2948. The Court cited the example of *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), which held that because the conduct at issue may have had beneficial justifications, it was "inappropriate to condemn without considerable market analysis." *NCAA,* 468 U.S. at 104 n. 26, 104 S.Ct. 2948.

The foremost treatise on antitrust law also observes that the per se and reasonableness approaches may be seen as a "single inquiry with varying presumptions." VII Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1511, at 418 (2d ed.2003). As Professor Areeda explains it, the per se rule developed as "merely a special case of the rule of reason," because it was an analysis that was "generalized for a class of behavior or for a class of claimed defenses" which could be analyzed similarly in almost all cases. *Id.* ¶ 1509a, at 396. In many instances, the behavior could be analyzed similarly because "the conceivable social benefits are few in principle, small in magnitude, speculative in occurrence, and always premised on the existence of price-fixing power that is likely to be exercised adversely to the public." *Id.* at 400. For this reason, Professor Areeda states that the per se rule should be "carefully limited to 'naked' restraints, which are restraints that lack redeeming social benefits." *Id.* ¶ 1509c, at 403. Accordingly, "when legitimate objectives are served, conduct constituting price fixing in the lay sense is not defined as the 'price fixing' that is per se unlawful." *Id.* ¶ 1511a, at 419.

In *California Dental Ass'n v. FTC,* 526 U.S. 756, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999), the Dental Association had imposed advertising restrictions on its members, which the FTC had found to be anticompetitive. The Court of Appeals affirmed the FTC's decision, and affirmed its decision to employ an abbreviated, or "quick-look," rule of reason analysis, an intermediate analysis between the per se rule and the rule of reason. The Supreme Court vacated and remanded for more scrutiny of the nature of the restrictions. Relying principally on *NCAA* and on Professor Areeda's analysis, the Court reiterated that there is no bright line between the per se rule and the rule of reason. The proper analysis, it ruled, should be thought of as a spectrum, rather than a dichotomy: "[T]here is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment. What is required, rather, is an enquiry meet for the case," *id.* at 780–81, 119 S.Ct. 1604, with justifications for the restriction to be taken into account. "The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow...." *Id.* at 781, 119 S.Ct. 1604.

Under this analysis of the per se rule applied to the facts of record, the plaintiffs have not shown a likelihood that the MSA and the challenged statutes constitute a per se violation of the Sherman Act. The record shows that the settlement between the states and the tobacco manufacturers

was intended to have, and in fact has had, important and redeeming social benefits, namely, the public health concerns to reduce tobacco consumption, particularly among youth, *see* MSA Art. I, at 2, to restrict the scope of cigarette manufacturers' advertising and marketing programs, and to shift to the tobacco manufacturers the health care costs caused by sales of their products. The New York Supreme Court, in approving the settlement between New York State and the OPMs, reflected in the MSA, compared the prayer for relief in the amended complaint with the provisions of the MSA in relation to the public interest, *State v. Philip Morris, Inc.,* 179 Misc.2d 435, 686 N.Y.S.2d 564, 568 (N.Y.Sup.Ct.1998), *aff'd,* 263 A.D.2d 400, 693 N.Y.S.2d 36 (N.Y.App. Div., 1st Dep't 1999), and found that the most important demands of the complaint had been achieved: an injunction against cigarette sales to minors, and against advertisements targeting them; greater disclosure of the health effects of tobacco and nicotine; and funding of educational and clinical programs intended to increase awareness and treatment of the health risks associated with cigarette smoking. Indeed, the court noted, some provisions of the MSA could not have been achieved through litigation, or even through legislation, such as the waiver by the participating manufacturers of their First Amendment rights to advertise and to lobby against adverse legislation. *Id.* at 568 & 569 n. 6; *see* MSA Art. III(d), (m), V. The court concluded:

> With all of these and the monetary provisions of the MSA, the court is confronted with a settlement that goes well beyond what could have been achieved in plaintiffs' fondest dreams for the result after a protracted and risky trial, that excels over the [earlier] Minnesota

settlement, and that painstakingly accommodates the public interest.

686 N.Y.S.2d at 569.

> [T]he MSA [and a companion settlement, the Smokeless Tobacco Master Settlement Agreement] adequately protect the public interest ... [T]he economic and noneconomic benefits for New York State are substantial [and] are consistent with and advance the objectives of New York public policy as set forth in the amended complaint.

*Id.* at 567.

This evidence suggests that the MSA and the Escrow and Contraband Statutes were intended not as "naked restraints on trade," as plaintiffs allege, but as restraints enacted for public health purposes. Under the reasoning of *NCAA* and Areeda, these restrains should not be tested without considering their redeeming social benefits, and accordingly may not violate a rule of per se illegality without such evaluation. *See Freedom Holdings I,* 357 F.3d at 223 ("For a statute to be preempted, the conduct contemplated by the statute must be 'in all cases a per se violation' of the federal antitrust laws." (quoting *Battipaglia v. N.Y. State Liquor Authority,* 745 F.2d 166, 174 (2d Cir.1984) (quoting *Rice v. Norman Williams Co.,* 458 U.S. 654, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982)))).

The second strand of caselaw pays attention to the character of the restraint in question rather than to why it might be justified. This definition of "illegal per se" was articulated most concisely in *Rice,* where defendant challenged a California law regulating the importation of alcohol. The Court held that for a state statute to be considered a per se antitrust violation, it must mandate or authorize "conduct that necessarily constitutes a violation of the antitrust laws in all cases," or place "irresistible pressure on a private party to violate the antitrust laws":

[A] state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute. Such condemnation will follow under § 1 of the Sherman Act when the conduct contemplated by the statute is in all cases a per se violation. If the activity addressed by the statute does not fall into that category, and therefore must be analyzed under the rule of reason, the statute cannot be condemned in the abstract. Analysis under the rule of reason requires an examination of the circumstances underlying a particular economic practice, and therefore does not lend itself to a conclusion that a statute is facially inconsistent with federal antitrust laws.

*Id.* at 661, 102 S.Ct. 3294. This formulation has been accepted by a number of subsequent cases. *See Fisher v. Berkeley,* 475 U.S. 260, 265, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986) (quoting *Rice* ); *324 Liquor Corp. v. Duffy,* 479 U.S. 335, 342, 345, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987) (quoting *Rice* ). Despite the outcome in *NCAA,* the Supreme Court in that case acknowledged that horizontal price fixing and output limitations are ordinarily considered illegal per se because they "always or almost always tend to restrict competition and decrease output":

> Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an "illegal per se" approach because the probability that these practices are anticompetitive is so high; a per se rule is applied when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. Colum-*

*bia Broadcasting System, Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). In such circumstances a restraint is presumed unreasonable without inquiry into the particular market context in which it is found.

468 U.S. at 100, 104 S.Ct. 2948; *see also* VII Areeda & Hovenkamp, Antitrust Law, ¶ 1510a, at 405 (calling this the "oldest meaning of 'per se illegality,' " and citing *United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th Cir.1898), *modified as to decree & aff'd,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *United States v. Trenton Potteries Co.,* 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); and *FTC v. Superior Ct. Trial Lawyers Ass'n,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990)).

Horizontal price fixing, output limitations, and market division are classic characteristics of a cartel. A cartel is defined as "[a] combination of producers or sellers that join together to control a product's production or price." Black's Law Dictionary 206 (7th ed.1999). "Competing firms form a cartel when they replace independent decisions with an agreement on price, output, or related matters." IIA Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 405a, at 26 (2d ed.2002). A cartel is strongest when it controls a large market share or when it is supported by market-based or external enforcement mechanisms. *See id.* ¶ 405c, at 29. But even an ineffective cartel may be invalid:

> [T]he cartel need not attain the profit-maximizing price or output to be profitable and socially harmful; indeed, even relatively poorly functioning cartels can be quite profitable. As a result, while many horizontal arrangements are beneficial and lawful, they generally receive the highest level of antitrust scrutiny.

II Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 405c, at 29 (2d ed.2002). Thus, if the offensive elements of a cartel are present, the cartel is likely to be held illegal per se under the Sherman Act, even if the cartel is less effective than its participants would like. *See Fisher,* 475 U.S. at 265, 106 S.Ct. 1045; *NCAA,* 468 U.S. at 100, 104 S.Ct. 2948; *Rice,* 458 U.S. at 661, 102 S.Ct. 3294; XI Herbert Hovenkamp, Antitrust Law ¶ 1902a, at 190–91.

The Second Circuit Court of Appeals quoted both *Rice, see Freedom Holdings I,* 357 F.3d at 222 (quoting *Fisher,* 475 U.S. at 265, 106 S.Ct. 1045 (quoting *Rice,* 458 U.S. at 661, 102 S.Ct. 3294)), and the approving language of *NCAA, see id.* at 225 (quoting *NCAA,* 468 U.S. at 100, 104 S.Ct. 2948), to support its holding that "[h]orizontal agreements among competing sellers to fix prices or restrict output are, absent more, per se violations of Section I of the Sherman Act." *Id.* at 225. Under this understanding of the per se rule, my examination of the record in relation to the MSA and the related statutory enactments should focus on whether they "mandate[ ] or authorize[ ] conduct that necessarily constitutes a violation of the antitrust law in all cases," or place "irresistible pressure on a private party to violate the antitrust law," and should not focus on the justifications for the alleged restraints. *Rice,* 458 U.S. at 661, 102 S.Ct. 3294.

The question at hand is which strand of analysis of the per se rule to apply. Classically, arrangements among oligopolists and a state that reward price and output stability are considered socially harmful, and therefore invalid, without further consideration of redeeming social justifications. *See* 15 U.S.C. § 1; *Fisher,* 475 U.S. at 268–69, 106 S.Ct. 1045 (citing *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035

(1951) and *Midcal* ); *cf. A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 534–35 & 531 n. 9, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (quoting § 3 of the National Industrial Recovery Act as declaring "the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; ... to eliminate unfair competitive practices, [and] ... to avoid undue restriction of production (except as may be temporarily required)," and invalidating the provision on other grounds). The Court of Appeals ruled to that effect, and immediately went on to question whether the *Parker v. Brown* exception rescued the antitrust restraint from invalidity. *Freedom Holdings I,* 357 F.3d at 225–26.

Cigarettes, however, are different from most other products, given the social ills caused by cigarette smoking and the perceived pernicious effects resulting from aggressive and extensive advertising and marketing of cigarettes. Classically, the public good is enhanced by free competition in pricing and vigorous and relatively unfettered advertising and marketing. Cheaper prices make goods more available, and drive free markets. But with respect to cigarettes, the public good can be furthered by higher prices and strong restraints on advertising and marketing, especially to young people. Higher prices and restrictions on advertising and marketing reduce the demand for cigarettes, lessening the injury to the public's health. Plaintiffs do not contest that cigarettes may be legitimately the subject of state governmental regulation, and any antitrust analysis of the effects of such regulation cannot be performed without giving proper consideration to the social purposes that state governments propose to achieve by such regulation.

Recent trends in antitrust law reflect a growing concern with potentially conflicting social policies. Labor law, for example, will permit a competitive restraint which classic antitrust analysis is likely to forbid. *See* 29 U.S.C. § 158 (protected activities under Labor Management Relations Act); *see, e.g., Clarett v. National Football League*, 369 F.3d 124 (2d Cir. 2004). This is so even where the restraint deals with applicants to a labor pool, for example, star high school football players forbidden to enter a hiring lottery run for the benefit of professional football teams, *see id.*, and even where the enforcement of such restraints potentially would create a violation, not only of classical antitrust law, but also of closed shop provisions of the Taft–Hartley amendments to the Labor Management Relations Act. *See Communications Workers of America v. Beck*, 487 U.S. 735, 747–54, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988) (reviewing the legislative history of the Taft–Hartley Act of 1947, and concluding that concerns over barriers to free employment were outweighed by concerns that unions' health not be eroded by free rider employees who declined to join but reaped the benefits of the unions' presence); *Marquez v. Screen Actors Guild*, 525 U.S. 33, 36, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998) (following *Beck*). In other fields, too, courts will refrain from strict application of antitrust doctrine because of sensitivity to other valuable social policies that potentially conflict with the interest of having free and unfettered markets, particularly where the conflicting social policy is expressed in a statute. *See, e.g., Jung v. Association of American Medical Colleges*, 339 F.Supp.2d 26 (D.D.C.2004) (dismissing antitrust suit challenging medical residency matching system, based on recently passed 15 U.S.C. § 37b); *Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 797 (2d Cir.2002) (alleged price-fixing scheme

"enjoys implied immunity from antitrust laws because the antitrust laws conflict with securities regulatory provisions"); *Miller v. American Stock Exchange*, 317 F.3d 134, 150 (2d Cir.2003) (same). Judicial sensitivity to other policies potentially conflicting with antitrust laws has extended also to consider important social policies that may not be specified by statute. *See, e.g., United States Postal Service v. Flamingo Industries (USA) Ltd.*, 540 U.S. 736, 748–49, 124 S.Ct. 1321, 1329, 158 L.Ed.2d 19 (2004) (the "nationwide, public responsibilities of the Postal Service" render it outside the reach of antitrust law); *Clarett*, 369 F.3d at 130 (limiting discussion to "non-statutory exemption").

This trend in favor of recognizing competing policies in the antitrust arena should apply here, where the considerable public health policies regarding cigarettes militate in favor of decreased consumption, particularly by young people, even if higher prices cause that end to be served, and even if higher prices are often considered antithetical to the goals served by antitrust law. Classic antitrust analysis must take into consideration the right of states to seek to further other, and equally important, social goals, even at the expense of pure antitrust analysis. *See* John E. Lopatka & William H. Page, *State Action and the Meaning of Agreement Under the Sherman Act: An Approach to Hybrid Restraints*, 20 Yale. J. on Reg. 269, 313–16 (2003) (calling *Bedell* "[a] particularly troublesome case" because "[i]t is one thing to thwart a mandate that has little purpose other than to facilitate collusion, but it is another to inhibit a government from taking action that may sensibly serve a legitimate public interest, even if it may also create an environment favorable to tacit collusion"). It would thus seem that I should choose the first strand of per se analysis; in determining whether an anti-

trust violation has occurred, I should consider not only whether prices have risen and output has been restricted, but also the State's justifications for the statutes that have allegedly caused the rising prices and output restraints.

As discussed above, were I to choose this strand of per se analysis, I would find that plaintiffs have shown no likelihood of being able to prove a per se violation of the antitrust laws. The MSA had, as a principal goal, limiting the scope of advertising and marketing, particularly to young people, a goal that would be likely to result in fewer sales and higher prices. The substantial payments required of cigarette companies also would be likely to result in higher prices and fewer sales. The justifications behind the MSA and the related statutory enactments are substantial and, as the New York Supreme Court found, *State v. Philip Morris*, 686 N.Y.S.2d at 568–69, are closely tied to the payment provisions embodied in the MSA. Sales of cigarettes were checked by the MSA's ban on advertising to youth and numerous other measures, and by high cigarette prices. Cigarette companies accepted the onus of paying substantially for the injuries to public health caused by cigarette smoking, and this reimbursement of expenses was made to apply to all cigarette companies selling cigarettes in and to the settling states, not only to signatories of the MSA. A payment stream was created extending into the future, anticipating public health needs that would continue to flow from future sales of cigarettes. This system created by the MSA could not be effective unless roughly equivalent burdens would be imposed on all other companies engaged in selling cigarettes in a particular state, as well as on the signatories to the MSA. The payment provisions accordingly do not represent a "naked restraint" on competition. *Cf.* VII Areeda & Hovenkamp, Antitrust Law ¶1509c, at 403.

Rather, the higher cigarette prices directly further legitimate state goals.

Ultimately, however, it may not matter which strand of per se analysis to apply. Even under the strand of per se analysis that limits the investigation to the nature of the restriction and discounts any consideration of potentially meritorious justifications, plaintiffs have not shown a likelihood that the MSA and the Escrow and Contraband Statutes constitute a per se violation of the Sherman Act. That is because the effects of the MSA and the Escrow and Contraband Statutes have proved not to be anticompetitive, as demonstrated by the sales and market share data compiled by PriceWaterhouse. Nor is it clear that the contested MSA and statutory provisions were intended and promulgated as market restrictions.

The proofs thus far presented in the record show that the MSA and the Escrow and Contraband Statutes have not demonstrably restricted the competitiveness of the NPMs. The record shows clearly that the NPMs have made substantial gains in volume and market share since the settlement was executed. Between 1998, when the MSA was executed, and 2003, NPM sales have increased from 2.43 billion to 33.31 billion cigarettes, for an increase in market share from 0.5 % to 8.2 %. Their gains in market share have been taken mostly from the OPMs but also from the SPMs, and the SPMs also have taken market share from the OPMs. Sales by OPMs have declined over 110 billion, from 455.22 billion to 344.61 billion, for a decline of over 24 % of sales by OPMs, resulting in a decline of 12 % of the OPMs' market share. SPM sales have increased from 14.12 billion to 30.8 billion cigarettes, a substantial gain against the OPMs but a decline as measured against the NPMs. These facts are inconsistent with the alle-

gations of a cartel, alleged in the Amended Complaint.

A price fixing agreement is no less unlawful, however, if the parties to it fail to carry it out effectively. II Areeda & Hovenkamp, Antitrust Law ¶ 405c, at 29. The Court of Appeals has also ruled that that the MSA, as alleged by plaintiffs and incorporated into the complaint, contains features of a cartel, and I must accept those rulings. *Freedom Holdings I*, 357 F.3d at 226; *Freedom Holdings II*, 363 F.3d at 154. Accordingly, if market conditions fail to bear out the arguments that the effect of the MSA's terms are anticompetitive, I must consider plaintiffs' arguments that the MSA's terms are anticompetitive in their intent or on their face. The Court of Appeals was required to accept these arguments in the posture of reviewing a motion to dismiss. In the present context, I may look to the evidence in the record and the competing interpretations of the MSA by the plaintiffs and the State.

Plaintiffs argue that the MSA and related statutory enactments establish a state-supported cartel; that the allocation of substantial payments among OPMs according to their relative market share, with adjustments that vary directly with their sales volume, provides a disincentive to gain market share at each other's expense and an incentive to increase their prices, rather than their output, as the way to maximize their profits. Thus, as plaintiffs argue, the OPMs have been increasing their prices even beyond that necessary to recoup their payments to the states, while experiencing decreased sales volume and market share.[16]

The MSA enables the OPMs to pay large sums to the states, and to continue paying large sums annually, by financing payments from future sales of cigarettes. The cigarette companies that signed the MSA presumably expected that they would be able to increase their prices to gain the extra revenue that would enable them to make the large payments due each year to the states. Since, in a normal market, companies without such burden could undersell the OPMs and eventually jeopardize the revenue stream upon which the states settled with the major cigarette companies, the MSA, in order to remain effective, had to protect the revenue stream due from the OPMs by creating an equivalent cost structure applicable to non-signatories.

The MSA accomplished that objective in two ways. First, manufacturers and importers of cigarettes who agreed to become signatories of the MSA within a sixty day period after the OPMs had executed the agreement gained an exemption from paying anything to the states to the extent their future annual sales remained at or below either 125 percent of their 1997 sales, or their 1998 sales, whichever sales level was higher; those SPMs also agreed to pay disproportionately greater amounts to the states than the OPMs to the extent their future sales exceeded those base lev-

---

**16.** A manufacturer, suffering an increase of costs, will normally wish to raise prices even more than necessary to recoup costs, in order to maintain desired profit margins and to compensate for reduced sales volume at the higher price level. The MSA provides, in such event, that the manufacturer's profits may prevent it from being entitled to the discount to the extent otherwise available for reduced sales volume. MSA Exh. E(b)(ii) reduces the OPMs' benefit from the Volume Adjustment if their income rises while volume of sales falls. However, the clause provides for only a percentage decrease in the Volume Adjustment, and it is possible, therefore, that OPMs may still increase their profits from price increases, even if they result in lower sales. The proofs did not treat this issue.

els. MSA Art. IX(i).[17] The effect, plaintiffs argue, was to entice manufacturers to join the MSA by offering them the benefits of the grandfather clause, and then to encourage these SPMs to follow the price leadership of the OPMs in order not to increase market share and thereby lose some of the cost advantage given to them if they maintain their sales at or below the base level. And the effect, plaintiffs argue, is significant since the PMs collectively control upwards of 90 percent of the cigarette market.

As to manufacturers and importers who did not join the MSA, the MSA provided the states with a strong incentive to enact measures to deter them from seeking a free ride based on a cost structure not including substantial, contractually required payments to the states. If PMs suffered a loss of sales and market share to the NPMs because of "disadvantages experienced as a result of the [MSA]," MSA Art. IX(d)(1)(C), the states would become subject to a trebled reduction in income from the PMs unless they passed and "diligently enforced" the Escrow Statute. MSA Art. IX(d)(2)(B). The states accordingly enacted the Escrow Statutes, requiring NPMs to make payments to the states based on their volume of sales. MSA Art. IX(d)(2)(B), (E), Exh. T. NPMs, not having become signatories to the MSA within the sixty-day period provided, are not granted an exempt base of sales, as are grandfathered SPMs, and thus are not benefited by the reduced, average cost base that SPMs enjoy. Furthermore, NPMs' escrow payments, because they are reversionary annually for interest accumulations and excess contributions, and reversionary after 25 years if states fail to sue or settle with them for having incurred expense because of injuries to the public

health caused by cigarette smoking, are not tax deductible, as are the payments made to the states under the MSA by OPMs and SPMs.

The MSA provides a strong incentive for the states to "diligently enforce[ ]" the Escrow Statutes. MSA Art. IX(d)(2)(B). When the Escrow Statutes appeared not to be sufficiently effective, the states enacted Contraband Statutes. These used the tax stamp practices of the states to assure that manufacturers and importers complied with the Escrow Statutes, for if they failed to bring themselves within its payment obligations, they would not be issued tax stamps and their cigarettes would be considered "contraband" if sold or distributed within the affected state. However, the Contraband Statutes appeared not to be any more effective than the Escrow Statutes, as the statistics of growing sales and market share of the NPMs, set out above, clearly show. One stratagem employed by the NPMs became the subject of the next enactment, the amendment of the Allocable Share Release provision, enacted by thirty states, including, on October 15, 2003, by New York. NPMs that distributed cigarettes to only a few states paid their per-cigarette tax directly to the states in which they made sales, satisfying the Escrow and Contraband Statutes. But these states could retain only their allocable shares of the aggregate payments made by the NPMs; the balance had to be returned annually to the NPMs under the Allocable Share Release provisions as initially enacted. As a result, it appears that the NPMs continued to have a competitive advantage in comparison to the cost burdens of the OPMs and SPMs. The Allocable Share Release provisions were amended in order to limit the NPMs' ability to arbitrage the allocation relationships among the states,

---

**17.** The formula of increase is provided in MSA Art. IX(i)(2). *Freedom Holdings II*, 363 F.3d at 153, cites it as an example of an unlawful restraint on trade.

by terminating the states' obligations to the extent of such arbitrage.

The many critics of the MSA contend that it creates a state-protected cartel. *See* Margaret A. Little, *A Most Dangerous Indiscretion: The Legal, Economic, and Political Legacy of the Governments' Tobacco Litigation*, 33 Conn. L.Rev. 1143, 1171 (2001). They accuse the states of countenancing high prices to enable the OPMs to finance the substantial amounts they undertook to pay to the states, and of protecting the market shares of the OPMs at 1997 or 1998 levels by enacting Escrow Statutes, followed by Contraband Statutes, followed by amendments to the Allocable Share Release provisions. As Little states:

> Economists and legal analysts have written extensively on the anticompetitive effects of the MSA and the four state settlements. They have leveled pointed criticisms at the provisions of the MSA that create high barriers to entry, that entrench the current market shares of the settling tobacco companies, and that eliminate price competition and facilitate price fixing among the settling tobacco companies.... The consensus of the academic commentators who have analyzed the MSA and the four separate settlement agreements is that they pose serious antitrust concerns and are anticompetitive in their effects.

Little, *A Most Dangerous Indiscretion*, 33 Conn. L.Rev. at 1173–74. The Court of Appeals agreed with these observations.

The State takes issue with plaintiffs' assertions that the payment provisions of the MSA are anticompetitive, arguing instead that they are neutral and serve legitimate state interests. Apportioning payments obligations among OPMs represents a fair way to divide the burden and to reflect changes in relative volume of annual cigarette sales; of greater relevance, appor-

tionment among OPMs is an internal matter which does not affect the ability of NPMs to compete in any material way. Likewise, the Volume Adjustment is a means of advancing the goal of reduced cigarette sales; it rewards decreasing sales and punishes increases. The granting of exemptions for SPM payments, if market positions did not grow from 1997 or 1998 levels, and disproportionately higher payments obligations if and to the extent SPMs gained market share above those levels, provided an incentive to SPMs to join the MSA and be bound by its restrictions, but limited or removed those cost benefits to the extent SPMs sought to take advantage of them and gain a competitive edge through the incentives provided by the MSA. *See* Lopatka & Page, *State Action and the Meaning of Agreement.*, 20 Yale J. on Reg. at 315 (noting that "[n]othing in the MSA or the [Escrow] Statutes explicitly authorized the Majors to set prices jointly" and that "[t]he best anticompetitive story that can be told" is that the large increase in OPMs' prices suggested that the payment provisions indirectly "fostered tacit collusion").

Noting the dictum of the Court of Appeals that a flat tax on cigarettes would not raise antitrust concerns, *Freedom Holdings I*, 357 F.3d at 229, New York State argues that the payment obligations provided by the MSA are the equivalent. Thus, NPM payments, by being fixed per cigarette sold, constitute a flat tax and, although differently expressed, amount to less than the per cigarette cost to OPMs and non-grandfathered SPMs. And the cost to grandfathered SPMs, although less on average because of the exemption based on 1997 and 1998 sales, are the same or greater with respect to incremental sales above the grandfathered levels. As the testimony of experts showed, production decisions are driven more by incremental

than by average costs. The conclusion urged by New York State is that the MSA does not establish a cartel, particularly as it might affect the competitive abilities of NPMs. The State argues, further, that the repeal of the Allocable Share Release provision of the Escrow Statute is irrelevant, because New York has not in practice been releasing to depositors any portion of escrow payments beyond New York's allocable share.

Faced with these competing explanations of the intrinsic nature of the MSA and the Escrow and Contraband Statutes, I cannot accept plaintiffs' arguments at face value without supporting evidence, at least not in connection with a motion for a preliminary injunction. *See* Lopatka & Page, *State Action and the Meaning of Agreement.*, 20 Yale J. on Reg. at 318 (calling for "intent evidence" to identify restraints). And the evidence plaintiffs have offered on the record is insufficient to prove an anticompetitive intent underlying the MSA. *See NCAA*, 468 U.S. at 100, 104 S.Ct. 2948 (per se condemnation attaches to a restriction where "the probability that these practices are anticompetitive is so high" that "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output"). Rather, the evidence seems to fit more closely with the State's view. The escrow payments required of NPMs are essentially a flat tax, assessed at a flat rate per cigarette sold, which the Court of Appeals ruled could be enacted. *Freedom Holdings I*, 357 F.3d at 229; cf. *Freedom Holdings II*, 363 F.3d at 152. The statistical data, as provided above, show that NPM payments are less than the payments of OPMs and of non-grandfathered SPMs. As compared with those manufacturers, the assessment on NPMs' sales is, if anything, more favorable than a flat tax, and the NPMs have no basis to complain.

It is true that NPM escrow payments are higher per cigarette sold than payments made by SPMs averaged down by the basis of 1997 or 1998 levels provided by the grandfather clause. A comparison of average costs, however, is not necessarily relevant. Jonathan Gruber, an MIT economist who submitted an affidavit on the State's behalf, teaches that marginal costs, not average costs, drive manufacturers' decision regarding how to price their products and how many cigarettes to sell. Manufacturers have an incentive to continue producing so long as the marginal costs incurred in making an additional sale are less than the revenue anticipated from that sale. Additional sales will be profitable up to that point, and accordingly, price and output levels are determined by costs on the margin, rather than by average costs. Grandfathered SPMs have lower average costs, but for all sales beyond their base levels (the number of sales which meets their 1998 or 125 % of their 1997 market shares), their marginal costs stemming from the MSA will continually rise—and at a higher rate than the marginal costs of NPMs stemming from the Escrow Statutes. NPMs, which pay a flat fee, will maintain the same MSA-derived marginal costs throughout their production. There was no proof that the pricing structure of the NPM payments yields a disadvantage, vis-à-vis the grandfathered SPMs, that would deter them from continuing to produce and promote their products. Instead, the increased marginal costs to the SPMs above the grandfathered levels can be viewed as a means of recouping those funds which were lost to the states through the grandfather provision.

The NPMs also argue that their payments suffer in comparison with those of all PMs because their payments are not tax deductible, while those of the PMs are. This fact, however, cannot by itself conclusively show that the NPMs suffer a com-

petitive disadvantage. The structure of the NPMs' escrow payments also differs from the structure of PM payments in other respects that are more beneficial to the NPMs: the NPMs retain reversionary rights to annual interest on their payments, and, the amendment to the Allocable Share Release provision aside, to the entirety of their payments above the level of the State's allocable share. Further, the NPMs retain a reversionary interest in the entirety of their escrow payments to the extent the State cannot collect on a lawsuit against them, or settlement with them, within 25 years. These benefits, which are not available to the PMs, appear to be substantial, and there has been no evidence to indicate that they are outweighed on the whole by the tax liability. I also note that if the tax liability of the escrow payments does in fact outweigh their relative benefits, the State argues that the tax liability may be traded away in exchange for those benefits. Although plaintiffs have attested that such an exchange is not possible in other states, New York State has maintained that it would be possible here, and neither side has submitted any evidence regarding the stance of the IRS on this issue.

Accordingly, plaintiffs have failed to show a likelihood that the MSA, or the Escrow or Contraband Statutes, constitute per se violations of the antitrust laws. Even were I to select the strand of per se analysis that looks to the nature of the restriction and not to its justifications, there is no indication from the evidence that the challenged provisions of the MSA and the Escrow and Contraband Statutes have the effect of stifling competition, or that they are facially anticompetitive.[18] I

therefore hold that plaintiffs have failed to establish a likelihood of success that the MSA and the statutes enacted pursuant to it constitute a per se violation of the Sherman Act.

■ I hold to this effect with respect to both the Escrow and Contraband Statutes. However, the October 15, 2003 amendment to the New York Allocable Share Release provision presents a different set of considerations. Each state, under the MSA, can retain only an agreed percentage of an NPM's aggregate contributions and must return any excess to the contributor. The states thus have agreed that the net escrow thus provided is sufficient to secure them against that manufacturer's or importer's eventual liability for a cigarette-based lawsuit. Any excess that the states wish to retain is, by the MSA's definition, surplus to their needs, and discriminatory against the NPMs, intended only to discourage the NPMs' competitive practices. On the record as it currently stands, the states have not shown any legitimate need to enact the Allocable Share Release provisions, except to give more aid and comfort to the OPMs than they should have to redress competitive disadvantage imposed by the MSA. Indeed, the State has failed to elicit any justification whatsoever for its passage of the amendment to the Allocable Share Release provision, stating only that the amendment is inconsequential because the provision had never been invoked. It appears from the record—including the fact that the repeals of the Allocable Share Release provision began occurring shortly after the OPMs fixed on them as lobbying goals, as reflected in their corporate literature—that the states passed these amend-

---

**18.** To the extent that any payment whatever could be seen as raising prices and restricting output, the Court of Appeals has laid such arguments to rest by ruling that a flat tax would be permissible, and such payments do not constitute per se violations of the antitrust laws because they are substantially justified by the public health gains which they advance. *Freedom Holdings I*, 357 F.3d at 229; cf. *Freedom Holdings II*, 363 F.3d at 152.

ments purely at the behest of the OPMs, and without any serious consideration of balancing the anticompetitive effects and any additional public health benefits that might be produced. I hold, therefore, that the plaintiffs have shown a likelihood of success with respect to the amendment to the Allocable Share Release provision.

### 2. Parker v. Brown

■ The Court of Appeals accepted plaintiffs' complaint as validly alleging that the MSA and ancillary statutes constituted a per se violation of the antitrust laws, and, assuming the truth of that allegation, proceeded to address whether they should be exempted from liability under the doctrine of *Parker v. Brown.* I assume, for the purposes of this section, that the MSA and ancillary statutory enactments constitute a per se antitrust violation, and I turn to consider, under *Parker v. Brown,* whether "(i) the restraint in question is 'clearly articulated and affirmatively expressed as state policy,' and [whether] (ii) the policy is 'actively supervised' by the state itself." *Freedom Holdings I,* 357 F.3d at 205 (quoting *Midcal,* 445 U.S. at 105, 100 S.Ct. 937); *see also Freedom Holdings II,* 363 F.3d at 155, 157. Judge Winter, for the majority, ruled that the State likely failed both criteria. Judge Sack, concurring, found that the State likely satisfied the first criterion, but failed the second. However, the true test of plaintiffs' allegations requires that they be tested against the actual proofs, and this is my task in the context of this motion for a preliminary injunction. *Freedom Holdings II,* 363 F.3d at 157.

In his rulings, Judge Winter elaborated that the restraint had to be not only "an express act of the state," a requirement that the State had met, but the State's purposes in agreeing to, and enforcing, the restraint had also to be "reveal[ed]" and shown to have a valid nexus to the restraint imposed. *Freedom Holdings II,* 363 F.3d at 155 (quoting *Freedom Holdings I,* 357 F.3d at 227). Elaborating further, Judge Winter held that even though the State had not adequately revealed its purpose, that failure, alone, would not be crucial. *Id.* The crucial issue is whether or not the State "actively supervised" the effects of its policy to prevent undue anticompetitive repercussions. *Freedom Holdings I,* 357 F.3d at 231. Thus, all three judges agreed that plaintiffs' allegation, that the State was not actively supervising the antitrust characteristics of the MSA and ancillary statutory enactments, was sufficient to uphold the complaint.

On the basis of the factual record presented to me, I now find that plaintiffs have not demonstrated a likelihood of success in showing either that the State has failed to reveal its underlying policies or that the State has failed to supervise actively the effects of its enactments. The several states, New York among them, settled with the four leading cigarette companies on the basis of the complaint they brought against them. As described earlier, the states sought substantial equitable and legal relief against the cigarette companies: compelling them to pay large sums to compensate for causing major injury to the public health and, by various measures, dampening future demand for cigarettes and restricting the cigarette companies' marketing and distribution strategies and behavior. *See New York v. Philip Morris,* 686 N.Y.S.2d at 568–70. The states substantially accomplished their objectives by their settlement with the cigarette companies, as reflected in the approval of the New York settlement by the New York Supreme Court. *Id.* The State accomplished its objectives in part through increasing production costs to all manufacturers: the increase in costs, passed along to consumers in the form of increased

prices, drove down demand, and the increased costs facing every manufacturer prevented any manufacturer from selling at an artificially low price, thereby taking advantage of others' compliance and spoiling the settlement. Clearly, the MSA, and the statutory enactments that implemented the MSA, reflect the policies expressed in its lawsuit against the OPMs.

As for the issue of "active supervision," the Court of Appeals observed:

> We are directed to no mechanism in the MSA or any of the related legislation whereby New York may "review[ ] the reasonableness" of the pricing decisions of tobacco manufacturers. *Midcal*, 445 U.S. at 105, 100 S.Ct. 937. Nor is there provision for New York to "monitor market conditions or engage in any 'pointed reexamination' of the program." *Id.* at 106, 100 S.Ct. 937. The PMs are therefore free to charge the profit maximizing price, the classic monopoly result.

*Id.* at 231.

New York State takes issue with these observations. The MSA provides a mechanism of monitoring: careful and reliable collection of statistical information by a nationally recognized firm of certified public accountants, for review by the states, the public, and actual and potential competitors, like plaintiffs. The statistical information shows, very clearly, that the MSA and the Escrow and Contraband Statutes have not had anticompetitive effects, and so long as that remains true, a careful collection and review of the data is all the supervision that is necessary to check any undue anticompetitiveness, and thus all that can be demanded by the law.

The statistical data show, as has been noted above, that the NPMs have successfully gained market share during the life of the MSA. Moreover, the data show that the demand curves for cigarettes are not inelastic, as plaintiffs alleged, but price-sensitive. Further, the NPMs' payment structure is not tied to that of the PMs or to their market share, and, contrary to plaintiffs' allegations, their incremental costs do not rise with their volume of sales, and they are not in any manner obliged to increase their prices in lock-step with the OPMs. In consequence, the price increases charged by the OPMs to finance their payment obligations to the states have caused them to lose substantial market share to the NPMs. That is, price increases have resulted in reduced sales, followed by additional price increases to compensate for lost sales, resulting in even more lost sales. The NPMs have succeeded to take away market share from the PMs, and not even the Escrow and the Contraband Statutes have succeeded in reversing the trend.

Because the State has closely tracked the competitive effects of the MSA and found no anticompetitive impact, no further active supervision is necessary. Further, the market dynamics created by the MSA have been the equivalent of "active supervision." As long as the NPMs can compete, the dangers of cartelization are checked. Even assuming that the MSA does enable a cartel, the *Parker v. Brown* exemption should apply, for the State has articulated its policies for the MSA explicitly in its underlying complaint, the terms of the MSA are appropriately tied to those policies, and the State remains poised through watchful statistical collection to correct undue restraints. Indeed, the New York Attorney General recently pressed claims to enforce the provisions of the MSA restricting cigarette companies from marketing cigarettes to youthful populations. And SPMs have recently sued the State because of its failures to enforce protective (and, presumably, anticompetitive) measures desired by the SPMs. *See*

Daniel Wise, News in Brief, *Spitzer Accuses Company of Marketing Kools to Youths;* and Daniel Wise, News in Brief, *Tobacco Firms Accuse Five States of Failing Obligations,* N.Y.L.J., June 17, 2004, at 1.

Plaintiffs have not shown a likelihood of success of being able to prove their allegations that the PMs have gained the ability to raise prices without losing market share, or that the Escrow and Contraband Statutes were passed for a discriminatory purpose, rather than to prevent NPMs from undermining the settlement and the public health purposes that the settlement was intended to serve. The Escrow and Contraband Statutes have prevented NPMs from free-riding on the payments required of OPMs and SPMs, by requiring NPMs to set aside proportionately equivalent funds to assure the states compensation will be available to them for injuries to the public that the NPMs are causing and will continue to cause by selling and distributing cigarettes within the settling states.

█ That is not the case, however, with respect to the recent repeal by the State of the Allocable Share Release provision, applicable to NPMs. As explained above, no compelling case has been advanced by the State showing a need for this enactment. The only purpose appears to be a desire to accommodate the PMs, and to protect them unduly against competition from the NPMs. Moreover, no nexus has been shown between protecting the health goals of the MSA and restricting the terms on which escrowed funds can be released. Plaintiffs have shown a likelihood that *Parker v. Brown* does not exempt the repeal of the Allocable Share Release provision of the Escrow Statute.

**19.** I do not intend any implication regarding the State's exposure to a monetary judgment

## C. Irreparable Injury

Plaintiffs contend that they are irreparably harmed by the alleged cartel, which erects high barriers against entry into the cigarette market in New York State. Even if they did enter the New York market, plaintiffs assert, they would be penalized for any increase in market share, so that the Escrow and Contraband Statutes would effectively keep their market share minimized. Plaintiffs allege that by exacting penalties on sales by SPMs and NPMs which represent an increase in market share, the output cartel established by the MSA and the related statutes allows the OPMs to set cigarette prices at the levels of their choosing and requires SPMs and NPMs to follow suit. According to plaintiffs, this scheme effectively fortifies the market position of the OPMs, and requires SPMs and NPMs to resign themselves to accepting smaller market positions.

█ I initially take care to circumscribe the issue on this prong of the motion for preliminary injunction. In searching for irreparable harm, the existence of a cartel is irrelevant; the question instead is what ongoing damages plaintiffs have suffered and are likely to suffer because of the alleged cartel. Further, damages which can be remedied at the close of trial are definitionally not irreparable. *See Great Earth,* 302 F.Supp.2d at 253 (citing *Pacific Electric Wire & Cable Co. v. Set Top Int'l, Inc.,* 2003 WL 23095564 (S.D.N.Y. Dec. 30, 2003)). Thus, a loss of earnings on account of the cartel may not necessarily be irreparable, because if plaintiffs prevail at trial, they may recover their losses from the manufacturing defendants, plus interest.[19] A loss of market

in an antitrust case under the Eleventh Amendment. *See, e.g., Bd. of Trustees of Univ.*

share, however, is difficult to quantify and represents the loss of an opportunity which may not be quickly or easily regained, and thus may be considered irreparable. *Cf. Cook Inc. v. Boston Scientific Corp.*, 2002 WL 31236289, 2002 U.S. Dist. Lexis 19223 (N.D.Ill. Oct. 1, 2002), *aff'd as modified, Cook Inc. v. Boston Scientific Corp.*, 333 F.3d 737 (7th Cir.2003) (granting injunction where the parties were competing in a race to the market, because damages based on loss of market share would be difficult to quantify); *Knudsen Corp. v. Nevada State Dairy Comm'n*, 676 F.2d 374 (9th Cir.1982) (affirming grant of preliminary injunction under *Parker v. Brown* because Nevada milk pricing laws harmed plaintiff's ability to compete by setting higher sale prices). And plaintiffs allege that the cartel prevents them from entering or gaining any foothold in the New York market.

Many provisions of the MSA have no bearing whatever on the NPMs' market share, and thus are not suitable subjects of a preliminary injunction. The payment structure for OPMs and SPMs, by themselves, are irrelevant as regards the NPMs. The allocation of payments among PMs, as well, has no bearing on NPM sales or market share. Although the OPM payments are adjusted based on volume, there is no indication that such an adjustment impacts NPMs' ability to gain market share. The payment aspects of the NPM Adjustment similarly do not impact NPMs, since the NPM Adjustment is effectively blocked by the universal passage of Escrow Statutes. If the NPM Adjustment affects the competitiveness of NPMs, it is in the incentives to the states to pass Escrow and Contraband Statutes, not in

the NPM Adjustment's payment provisions standing alone.

The grandfather clause, by decreasing the payment obligations and therefore also the production costs of grandfathered SPMs, appears to give a competitive advantage to the SPMs against the NPMs, and perhaps to impact negatively the competitiveness of NPMs. This disadvantage may not constitute irreparable harm, however. As explained by the State's expert, because manufacturers and distributors make production and pricing decisions based on incremental costs rather than on average costs, incremental costs are the more important measure of competitive effect. And because the SPMs' incremental costs are higher—they must pay an increasingly high percentage as their market share rises above grandfathered levels, *see Freedom Holdings II*, 363 F.3d at 153—the NPMs should not be deterred from producing and selling cigarettes based on the competition from grandfathered SPMs, and as such are not irreparably harmed by the grandfather provision.

Plaintiff faces another, more crucial problem in demonstrating irreparable harm: the evidence shows no adverse impact on NPMs' market share stemming from the MSA or the Escrow or Contraband Statutes. Instead, the statistical evidence shows, and plaintiffs acknowledge, that the SPMs and NPMs have in fact gained market share over the life of the MSA, in comparison with the OPMs, who have lost market share. Further, the data show, and plaintiffs acknowledge, that the NPMs have gained market share more rapidly and to a larger extent than the SPMs. As such, it is difficult to see how the NPMs have been irreparably harmed

*of Ala. v. Garrett*, 531 U.S. 356, 363–64, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (Eleventh

Amendment immunity from suit).

by the alleged restrictions on their gaining market share.

The Court of Appeals was aware of this issue, and, in 12(b)(6) posture, accepted plaintiffs' explanation for it. As Judge Winter explained it, the OPMs suffered a loss in market share because of "difficulties in enforcing the Escrow Statute, in particular against foreign manufacturers." *Freedom Holdings I*, 357 F.3d at 231. However, the Contraband Statutes were passed "in response to this threat," *id.*, with the effect, as alleged by plaintiffs, that the cartel would tighten, the loopholes would be closed, and plaintiffs and other NPMs would not be able to sell cigarettes outside of the settlement structure, thereby having to adhere to price and output leadership by the majors.

If this explanation were accurate, however, the market shares of the SPMs and OPMs would have leveled off or declined beginning with the passage of the Contraband Statutes on December 28, 2001. Yet the evidence shows, and plaintiffs acknowledge, that the reverse continued to happen; SPMs, and even more prominently NPMs, continued to gain market share, to the detriment of the OPMs. The evidence thus belies not only plaintiffs' allegations, but also their interpretation of the facts.

At oral argument on the present motion, plaintiffs again alleged that the State had "turned the corner." Tr. June 2, 2004, at 26. Plaintiffs argued that the repeal of the Allocable Share Release provision would force NPMs into submission; that from the date of the repeal onward, the cartel would be fully and firmly established; and that plaintiffs and all others would find it impossible to gain market share in New York, and presumably in the other twenty-nine states which have repealed that provision.

Before I analyze that claim, I note its significance. Plaintiffs filed suit in 2002, alleging that the cartel was already firmly in place and the barriers to their entry into the New York market were already prohibitive. As defendants observed at oral argument, plaintiffs now are essentially admitting that the evidence, as of the time they filed suit, was insufficient to sustain their claim, and they are asking me now to focus not so much on the evidence relating to the prior enactments, as on the evidence since October 15, 2003, the effective date of the repeal of the Allocable Share Release provision, and on what may be likely in the future. In effect, plaintiffs concede that the passage of the Escrow and Contraband Statutes did not sufficiently cause them to lose market share. Indeed, the statistics of sales and market shares collected by PriceWaterhouse require that concession. Plaintiffs thus concede, as the facts of record require, that they are not able to prove a likelihood of irreparable injury, except for speculation what the future might bring. I thus decline to grant a preliminary injunction, enjoining enforcement of the Escrow and Contraband Statutes, or the MSA. I now turn to analyzing the repeal of the Allocable Share Release provision.

 As explained above, the repeal of the Allocable Share Release provision, N.Y. Pub. Health Law § 1399–pp, as amended, 2003 N.Y. Laws 666, eff. Oct. 15, 2003, took away the NPMs' reversionary right to escrow payments beyond the rights or needs of particular states, and provided a windfall to those states. The repeal discriminated against NPMs and served to deter them from competing in local and regional markets, where they otherwise could have concentrated costly marketing and distribution expenses, minimized their payments to the states, and competed effectively against the cigarette majors. Thus the barriers against NPMs have been heightened dramatically by the

repeal, and the ability of an NPM to compete within a regional market has been arrested. Plaintiffs submit affidavits from executives at several NPMs which aver that because their payment obligations have been dramatically increased, they have been forced to raise prices, and as a result their sales have substantially decreased. S & M Brands, which chose to maintain low prices and increase its market share in the southeast, has suffered a competitive disadvantage in Tennessee and Kentucky. CigTec Tobacco, LLC, another NPM which competed vigorously under the Escrow and Contraband Statutes, was forced by the repeal to increase its price from $7.50 to $10.60 per carton. As a result, between the first and second halves of 2003, it suffered a 69 percent decline in sales in Louisiana and a 39 percent decline in sales in Alabama. ITP, the second named plaintiff, suffered similarly. After raising its prices in the face of the repeal of Indiana's statute, its sales dropped over forty percent, from approximately 400,000 to approximately 232,000 cigarettes a month. Four months after Indiana repealed its statute, ITP could no longer afford to sell cigarettes in Indiana.

This evidence suggests, therefore, that plaintiffs, and other NPMs on whose behalf they also bring suit, are likely to be caused—and in some cases appear already to have been caused—irreparable injury stemming from the repeal of the Allocable Share Release provision. The evidence is, undoubtedly, still preliminary. Most of the affidavits regarding the economic impact of the repeal of the Allocable Share Release provision came into the record on supplemental briefing, and as such have not been subjected to testing or to a full opportunity for the State to oppose them. The State thus may yet defeat any requested permanent injunction. Nonetheless, plaintiffs have adequately shown a likelihood of irreparable harm from the repeal of the Allocable Share Release provision. In the absence of adequate state justifications for repeal, other than to defer to the OPMs and discriminate against the NPMs, I hold that plaintiffs have made a sufficient showing of irreparable injury with regard to the repeal of the Allocable Share Release provision, and I grant plaintiffs' motion to enjoin enforcement of the repeal.

## III. Conclusion

I find that plaintiffs have demonstrated neither a likelihood of success on the merits nor irreparable harm with regards to the MSA, the Escrow Statute, and the Contraband Statute. I thus deny plaintiffs' motion for preliminary injunction inasmuch as it is directed against these provisions. I find, however, that plaintiffs have made a showing of likelihood of success and of irreparable harm as regards the repeal of the Allocable Share Release provision. Accordingly, to that extent, plaintiffs have satisfied the requirements for, and I accordingly grant, a preliminary injunction, enjoining the amended version of N.Y. Pub. Health Law § 1399–pp, as amended, 2003 N.Y. Laws 666, eff. Oct. 15, 2003.

The parties shall appear before me on October 4, 2004, at 4:00 p.m. for a status conference, to discuss the status of the pending motion for summary judgment and future proceedings.

SO ORDERED.